# In the United States Court of Federal Claims

No. 15-315C

(Filed: January 24, 2017)

| | |
|---|---|
| FIRST CRYSTAL PARK ASSOCIATES LIMITED PARTNERSHIP,<br><br>        Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>        Defendant. | Keywords: Breach of Lease; Offer and Acceptance; Counter-offer; RCFC 56; Summary Judgment; Contracting Officer. |

*Mary Beth Bosco*, Holland & Knight, Washington, DC, for Plaintiff. *David S. Black*, Holland & Knight, Tyson's Corner, VA, *Kelly A. Krystyniak*, Holland & Knight, Washington, DC, and *Leila S. George-Wheeler*, Holland & Knight, Washington, DC, Of Counsel.

*Sheryl L. Floyd*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were *Deborah A. Bynum*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant. *Heather R. Cameron*, Senior Assistant General Counsel, Real Property Division, General Services Administration, Washington, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

      This case is currently before the Court on the parties' cross-motions for summary judgment. The General Services Administration (GSA) had leased space in a building in Arlington, Virginia from Plaintiff First Crystal Park Associates Limited Partnership (First Crystal). First Crystal contends that GSA exercised the renewal option in the parties' lease agreement but then failed to honor it. For the reasons discussed below, the Court concludes that GSA never exercised the renewal option, nor did it otherwise reach an enforceable agreement to modify the lease or enter a new one. Therefore, First Crystal's motion for summary judgment is **DENIED** and the government's motion for summary judgment is **GRANTED**.

**BACKGROUND**[1]

**I.    The Lease**

First Crystal and GSA entered into Lease Number GS-11B-02077 ("the Lease") on January 29, 2009.[2] Pl.'s Mot. for Summ. J. (Pl.'s Mot.) Ex. 1.[3] The Lease was for office space in "the building know[n] as 2011 Crystal Drive, located at 2011 Crystal Drive, Arlington, VA." Id. at 2. It covered a total of 20,240 rentable square feet of space on the eleventh floor, consisting of 8,545 rentable square feet in Suite 1100/1100A and 11,695 rentable square feet in Suite 1106. Id. The Lease also included two "unreserved parking permits." Id. The annual rent for the space was $838,335.20 and the term of the Lease was five years, beginning January 1, 2009, and ending December 31, 2013. Id.

Paragraph 5 of the Lease stated that "[t]his lease may be renewed at the option of the Government" and set forth the terms and rental rate of the renewal. Id. It provided, in pertinent part, that:

> The Government shall have the right to one (1) renewal option for a FIVE-YEAR TERM at an annual rent of $880,402.80 [($43.4981621 BRSF or $52.53/BOASF) + $6,343.44 for two (2) unreserved parking permits] for a total annual rent of $888,748.24 payable at the rate of $73,895.52 per month in arrears plus cumulative operating expense adjustments from the initial lease term . . . . The renewal option shall become effective provided notice be given in writing to the Lessor of the Government's intent to exercise such option at least 270 days before the end of the original lease term; all other terms and conditions of this lease shall remain the same during any renewal term. Said notice shall be computed commencing with the day after the date of mailing.

Id. (emphasis and brackets in original).

Also on January 29, 2009, First Crystal and GSA entered into Supplemental Lease Agreement Number 1 (SLA 1). Pl.'s Mot. Ex. 2. SLA 1 stated that it was "being issued to reflect an expansion of 6,431" rentable square feet, including 5,215 square feet of "office and related space in Suite 300 located at 2011 Crystal Drive." Id. at 1. Accordingly, SLA 1 stated that "[t]he

---

[1] The facts in this section are based on the deposition transcripts and the documentary evidence supplied by the parties in support of their summary judgment motions. Where a fact is in dispute, it is noted.

[2] The actual tenant was the Department of Defense. See Pl.'s Mot. Ex. 12 at 7–9; see also Pl.'s Mot. Ex. 14 at 1.

[3] The parties used GSA's "Standard Form 2" for the Lease, but struck Paragraph 4, which would have given the government the right to terminate the Lease at any time with appropriate notice. Pl.'s Mot. Ex. 1 at 2.

2

Standard Form 2 shall be amended to read as follows," and then set forth four new paragraphs to supersede the corresponding original paragraphs in the Lease. Id. Paragraph 1 of the Lease was amended to encompass the additional space. Under Paragraph 1, as amended, the Lease encompassed a total of approximately 26,671 rentable square feet, which in turn consisted of 8,545 rentable square feet in Suite 1100/1100A, 11,695 rentable square feet in Suite 1106, 6,431 rentable square feet in Suite 300, and the two parking permits. Id. Paragraph 3 of the original lease was also amended to increase the annual rent under the Lease from $838,335.20 to $1,098,790.70. Id. at 2.

Finally, and most pertinent to this case, SLA 1 set forth a new Paragraph 5 that modified the original renewal option so that it would cover both the eleventh floor space and the newly added third floor space. As amended, Paragraph 5 reads, in pertinent part, as follows:

> The Government shall have the right to one (1) renewal option for a FIVE-YEAR TERM at an annual rent of $1,156,935.80 [($43.378044/BRSF or $52.647818 / BOASF) + $6,343.44 for two (2) unreserved parking permits] for a total of $1,163,279.24 payable at the rate of $96,939.9367 per month in arrears plus cumulative operating expense adjustments from the initial lease term . . . . The renewal option shall become effective provided notice be given in writing to the Lessor of the Government's intent to exercise such option at least 270 days before the end of the original lease term; all other terms and conditions of this lease shall remain the same during any renewal term. Said notice shall be computed commencing with the day after the date of mailing.

Id. (emphasis and brackets in original).

II.   **Dispute Over Renewal of the Lease for the Eleventh Floor Space**

   A.   **The February 28, 2012 Email**

James Joiner, Jr., was a lease contracting specialist with GSA during the term of the Lease. See Pl.'s Mot. Ex. 5 at 2. Also known as "leasing specialists," lease contracting specialists "assist [contracting officers] and may perform all duties that do not legally obligate the Government." Def.'s Mot. App. at A216 (Public Building Service (PBS) Leasing Desk Guide).[4]

---

[4] In contrast, lease contracting officers "perform the warranted duties that obligate the Government, including executing and administering lease contracts." Def.'s Mot. App. at 217.

On February 28, 2012, Mr. Joiner sent an email to Gregory Redding, First Crystal's representative with respect to matters related to the Lease.[5] The subject line of the email read "GS-11B-02077 Renewal Option and Early Termination of Expansion." Pl.'s Mot. Ex. 5 at 1.

In the first paragraph of the email, Mr. Joiner stated that "[t]he United States of America hereby exercises its renewal option under Paragraph 4[6] of Lease No. GS-11B-02077, for a period of five years." Id. He stated that the government had a "valid" renewal option "pursuant to Paragraph 5 of [the] Lease." Id. He then quoted, as follows, the original version of Paragraph 5 (which did not reflect its amendment by SLA 1):

> The Government shall have the right to one (1) renewal option for a FIVE- YEAR TERM at an annual rent of $880,402.80…This lease may be renewed at the option of the GOVERNMENT… The renewal option shall become effective provided notice be given in writing to the Lessor of the Government's intent to exercise such option at least 270 days before the end of the original lease term.

Id. (emphasis and omissions in original).

Mr. Joiner then reiterated that the "letter is hereby-official notification that the Government exercises its renewal option right as provided under this lease for approximately 20,240 BRSF yielding 16,760 BOASF." Id. He further stated that "[t]his action will be followed up with a supplemental lease agreement in the near future." Id.

In the next paragraph, Mr. Joiner addressed the third floor space that had been added to the Lease by SLA 1. He stated that "[a]dditionally, per SLA #1, we would not like to renew the expansion space portion of the lease (6,431 BRSF yielding 5,215 BOASF)." Id. He explained that, in accordance with the Department of Defense's Base Realignment and Closure (BRAC) initiative, the Department of Defense would be "vacating a good portion of their leased and Government-owned inventory" between September 15, 2011 and August 31, 2012. "With this in mind," Mr. Joiner observed, "I would also like to request that you allow GSA to terminate [the third floor] portion of the lease effective March 1, 2012." Id.

The following day, Mr. Redding responded to Mr. Joiner via email. Pl.'s Mot. Ex. 7. He advised Mr. Joiner that "[w]hile the lease renewal option does not give the Government the right to selectively renew one portion of the leased space but not the rest, we are willing to accept the long renewal of just the . . . 11th floor per the renewal option" subject to certain conditions. Id. at 1. Specifically, First Crystal offered to renew only the eleventh floor space if the government agreed to "renew the 3rd floor space . . . for two (2) weeks, from January 1, 2014, to January 15,

---

[5] Mr. Redding was secretary of the general partner of First Crystal, as well as a vice president and division counsel with First Crystal's management and leasing company, Vornado Charles E. Smith LP (Vornado). Pl.'s Mot. Ex. 12 at 3.

[6] Mr. Joiner's citation to Paragraph 4 was in error. The renewal option was contained in Paragraph 5 in both the original Lease and in the Lease as amended.

4

2014." Id. Mr. Redding stated that after the government vacated the third floor space, First Crystal would "market [it] immediately," and, if it found a new tenant for a term exceeding January 15, 2014, First Crystal would waive any further government liability for the third floor space as of the date of the replacement lease. Id. Mr. Redding closed by noting that it was his hope that Mr. Joiner "will regard this as a fair balancing of the various interests, as it gives the Government the space it desires to keep long term along with a reasonable likelihood that the Government will be relieved of liability for the 3rd floor space earlier than it is otherwise entitled." Id. He closed his email by stating "[l]et me know if this works for you." Id.

On February 29, 2012, Mr. Joiner forwarded Mr. Redding's response to the contracting officer, Seyi Gbadegesin, without comment. See Pl.'s Mot. Ex. 8 at 2. Mr. Gbadegesin replied to Mr. Joiner by saying "[l]et's discuss." Id. at 7.

The next day, March 1, 2012, Mr. Joiner sent another email to Mr. Redding. Pl.'s Mot. Ex. 9. He advised Mr. Redding that the government had a "problem . . . renewing [the third floor space] for only 2 weeks" and that "[t]o be frank, there is no way that I can do this." Id. Mr. Joiner told Mr. Redding that he could not "get approval from management" because GSA's "systems will not accommodate such an action." Id. He further informed Mr. Redding that this was "not a 'financial issue.'" Id. Mr. Joiner closed this email by asking whether they "[could] agree to everything else" after Mr. Redding discussed the matter further with First Crystal. Id.

That same morning, Mr. Redding responded to Mr. Joiner. Pl.'s Mot. Ex. 10. He asked whether GSA could renew the third floor space if First Crystal did not charge GSA any rent for those two weeks. Id. Neither Mr. Joiner nor anyone else at GSA responded in writing to this email. See Pl.'s Mot. Ex. 12 at 14 (Dep. Tr. 50–51); see also Pl.'s Mot. at 8 ¶¶ 14–15.

According to First Crystal, Mr. Redding and Mr. Joiner subsequently spoke by phone on or about March 1, 2012. See Pl.'s Mot. Ex. 12 at 14 (Dep. Tr. 50–51). Mr. Redding testified that during that conversation he and Mr. Joiner agreed to a two week extension of the third floor space at no rent. Id. Further, when asked during his deposition whether he "understood [there] to be an agreement, oral agreement with Mr. Joiner as -- on or about March 1st, 2012 regarding the terms of the renewal" of the Lease, he responded "[y]es." See id. (Dep. Tr. 52).[7]

### B. Subsequent Communications Regarding the Lease

The parties do not dispute that First Crystal and GSA did not execute any subsequent written agreement relating to a renewal of any of the space at 2011 Crystal Drive. See, e.g., Pl.'s Mot. Ex. 12 at 14 (Dep. Tr. 50–53); Pl.'s Mot. Ex. 26 at 2. But at some point between April and June 2012, the government vacated the third floor expansion space. See Pl.'s Mot. Exs. 15–16; Def.'s Mot. App. at A452 ¶ 14. Thereafter, First Crystal began marketing that space. Pl.'s Mot. Ex. 3 at 3 ¶ 16.

---

[7] At oral argument on the cross-motions for summary judgment, the government conceded that Mr. Redding and Mr. Joiner reached a verbal agreement about the renewal of the Lease as to the eleventh floor space. Oral Argument of Jan. 12, 2017 at 37:21.

5

On August 2, 2012, Mr. Redding sent another email to Mr. Joiner on the same email chain referenced above, containing the subject line "GS-11B-02077 Renewal Option and Early Termination of Expansion." Pl.'s Mot. Ex. 13 at 1. He advised Mr. Joiner that "we need to pick this renewal project up and move forward on it." Id. Additionally, he noted his "belie[f]" that he and Mr. Joiner "had agreed verbally that the 11th floor space would be renewed per the renewal option, that the 3rd floor space would be renewed for 2 weeks rent free and that VNO would start marketing the 3rd floor space." Id. He closed by asking Mr. Joiner "[w]ill you be preparing the SLA?" Id.

Mr. Joiner did not respond to Mr. Redding's August 2, 2012 email. See id. But on August 24, 2012, the Department of Defense informed Mr. Joiner, via email, that it "no longer ha[d] a continuing need at Crystal Park One under lease number LVA02077" and it "[r]equest[ed] to be released at lease termination." Pl.'s Mot. Ex. 14 at 1–2.

Mr. Redding emailed Mr. Joiner again on September 10, 2012. Pl.'s Mot. Ex. 13 at 1. He asked "where are you on preparing the SLA for this one?" Id. Mr. Joiner responded in a September 11, 2012 email in which he apologized for "not getting back" to Mr. Redding. Id. He explained that GSA had been "working overtime trying to complete the BRAC close-out," that he knew "this SLA [wa]s important," and that he would "try to have it" to Mr. Redding "in the next couple weeks." Id.

### C. GSA Notifies First Crystal That It No Longer Needs the Eleventh Floor Space; a Dispute Arises as to Whether GSA has Already Exercised the Option to Renew the Lease

On October 26, 2012, Mr. Joiner emailed Mr. Redding again. In this email, he informed Mr. Redding that, in light of Defense Department reductions, GSA no longer required any of the space at 2011 Crystal Drive. Pl.'s Mot. Ex. 20 at 1. Specifically, he wrote that the "Department of Defense is consolidating their resources and no longer requires the remaining square footage under this lease." Id. Mr. Joiner stated that he would "contact [Mr. Redding] this next fall to start the termination process." Id.

Mr. Redding responded the next day, on October 27, 2012. He advised Mr. Joiner that, in his view, "GSA ha[d] already exercised the renewal option." Id. He noted that First Crystal intended to "hold GSA to that regardless of DOD's plans for the space." Id. On January 16, 2013, Mr. Joiner forwarded Mr. Redding's October 27, 2012 email to CO Gbadegesin. Pl.'s Mot. Ex. 21 at 1. Just over five months after that, in a June 21, 2013 letter, a new contracting officer, Tawanda Beverly, rejected First Crystal's contention that GSA had already exercised its option to renew the eleventh floor space. Pl.'s Mot. Ex. 22. CO Beverly advised that after reviewing the emails between Mr. Redding and Mr. Joiner, she had concluded that "[t]he option was not exercised and GSA will not be responsible for any rent payments after the lease expiration date of December 31, 2013." Id. at 1. She asserted that "Mr. Joiner is not a Contracting Officer and, therefore, does not have actual authority to exercise a lease option." Id. CO Beverly also wrote that Mr. Joiner "had no implied authority, because he had no delegated authority to renew the Government's lease contract." Id.

6

"Additionally," CO Beverly asserted, "although Mr. Joiner stated that the option was exercised, it was ineffective as a counter-offer." Id. She described the emails between Mr. Joiner and Mr. Redding subsequent to the February 28, 2012 email as "simply propos[ing] counter offers" and stated that "[t]here are no indications that any counteroffer was accepted or that both you and Mr. Joiner understood the terms of a mutual agreement." Id. And, "[e]ven if a contract was formed," she stated, "the government would not be bound by Mr. Joiner's actions because he lacks authority." Id. at 2.

Mr. Redding responded to CO Beverly's letter on July 16, 2013. Pl.'s Mot. Ex. 23. He wrote that First Crystal was "entitled to rely on Mr. Joiner's conduct, as ratified by GSA." Id. at 1. Mr. Redding alleged that First Crystal "reasonably believe[d] that Mr. Joiner had the authority to act for and bind the government," that it "relied on this conduct," and that it would be "prejudiced if GSA were to disregard his actions now." Id. According to Mr. Redding, "over the course of many years" GSA had affirmed Mr. Joiner's authority to act for and bind the government by having Mr. Joiner "terminate leases and take other contractual actions." Id. He cited instances in which Mr. Joiner exercised lease terminations and in which other lease contracting specialists purportedly exercised lease options. Id. Mr. Redding continued that "[i]n reliance on Mr. Joiner's exercise of the renewal option," First Crystal had "not marketed the subject space to other potential tenants" and had "not tak[en] other steps it had taken with other vacated space to prepare them for occupancy by others." Id.

Further, Mr. Redding opined that Mr. Joiner's email of February 28, 2012 "was unambiguous and was not in any way made contingent upon an agreement with respect to the [third floor space] that he desired to terminate early." Id. Mr. Redding also alleged that he and Mr. Joiner "did in fact agree verbally on the phone to the terms respecting [the third floor space]." Id. He concluded that First Crystal "expect[ed] the government to honor the exercise by Mr. Joiner of the lease option" for the eleventh floor and "the agreement we reached . . . with respect to the [third floor space]." Id. at 2. He warned that if the renewal was not honored First Crystal would pursue legal action as well as "appropriate action with respect to termination options purportedly exercised by Mr. Joiner" and other similarly situated GSA employees on other First Crystal leases. Id.

At some point after Mr. Redding submitted this letter, Vornado (as First Crystal's management and leasing company) requested a meeting with GSA regarding the parties' dispute. See Def.'s Mot. App. at A284–85 (Dep. Tr. 64–65); see also id. at A318 (Dep. Tr. 66–68). This meeting took place in November 2013. Id. at A284–85; see id. at A318. T.C. Hairston, Jr., a GSA contracting officer, testified that each party "presented their side," but that the government believed that "if the contracting officer doesn't exercise the option, the government has not exercised its option under the lease," and as a result, the parties reached a "stalemate[]." Id. at A318–19 (Dep. Tr. 68–68).

### D. The Lease is Terminated

By late November 2013, the government had vacated the remainder of the leased premises at 2011 Crystal Drive. See Def.'s Mot. App. at A452 ¶ 16. GSA continued to pay full rent on all space until the end of the period prescribed in the Lease, December 31, 2013. See id. ¶¶ 15–16.

7

On December 23, 2013, CO Beverly emailed Mr. Redding to advise him that she would be "forwarding a[n] SLA to terminate the . . . lease." Pl.'s Mot. Ex. 24 at 3. That same day, Mr. Redding replied that First Crystal would "not be signing the SLA." Id. CO Beverly responded, noting that it was her understanding that First Crystal was marketing the space vacated by GSA. Id. at 2. Mr. Redding replied that First Crystal was doing so only "[i]n the interest of mitigating our damages." Id. at 1–2.

### III. First Crystal's Request for a Contracting Officer's Final Decision

On February 4, 2014, Mitchell N. Schear, the president of Vornado and an "authorized signatory" for First Crystal, submitted a request for a contracting officer's final decision in a letter forwarded to CO Beverly via email. Pl.'s Mot. Ex. 25. Mr. Schear asserted that GSA had exercised a renewal option for the eleventh floor space when Mr. Joiner sent Mr. Redding the initial February 2012 email purporting to do so. See id. at 3. He stated that "GSA's subsequent refusal to honor the renewal exercise is a breach of the Lease." Id. First Crystal continued that "Mr. Joiner had actual authority to renew the Lease" because the "Lease does not specify who must sign the lease renewal notice," but "does name specific individuals who are authorized to take other actions under the lease." Id. Alternatively, First Crystal argued that "Mr. Joiner had implied or apparent authority" to renew the lease as evidenced by the actions of Mr. Joiner and other lease contracting specialists in terminating other leases. See id. at 3–4.

Based on its contention that GSA was "bound by its action renewing the Lease," First Crystal asserted that it was entitled to "monthly rent in the amount of $78,598.67 plus continued adjustments for changes in real estate taxes . . . plus continued operating cost adjustments." Id. at 4–5. Further, it stated that "these damages . . . are continuing in nature." Id. at 5. "In the alternative," First Crystal argued, "should GSA maintain its position that Mr. Joiner did not have the authority to exercise the lease renewal," then "GSA has not validly terminated eleven of Vornado's other leases." Id. First Crystal therefore demanded "additional rents on these leases total[ing] $13,184,215.11." Id.

On April 4, 2014, CO Beverly issued a "Contracting Officer's Final Decision." Pl.'s Mot. Ex. 26. She stated that she had reviewed First Crystal's request and "associated records" and her "review . . . support[ed] the final decision that [the Lease] was not effectively renewed because James Joiner did not have proper authority to exercise a renewal option." Id. at 1.

CO Beverly noted that "[n]o supplemental lease agreement was ever prepared or executed to memorialize the exercise of the renewal option." Id. at 2. She asserted that "actual authority is required to bind the Government" and that "Mr. Joiner has not been delegated any contracting authority and he is not a warranted contracting officer." Id. Therefore, CO Beverly concluded that "Mr. Joiner did not have the actual authority to bind the government." Id. at 3. She also stated that "acting on Mr. Joiner's e-mail renewal, without seeking verification from the Contracting Officer, was a decision taken at the Lessor's risk." Id. at 2. She further asserted that Mr. Joiner did not have any implied or delegated authority to exercise the renewal option because "he would have had to have authority to obligate the Government funds required" and "[o]nly a warranted Contracting Officer can commit the Government to expending funds." Id. at 3.

8

Finally, CO Beverly rejected as irrelevant situations cited by First Crystal in which lease specialists had terminated other leases with First Crystal on behalf of GSA, noting that "[a] termination does not require an obligation of additional Government Funds." Id. Further, CO Beverly noted that the actions taken by lease contracting specialists on the other leases were "either memorialized in bilaterally signed SLAs and/or impliedly ratified by being part of the negotiated GSA/VNO 'marketability program.'" Id.

## IV. This Action

On March 27, 2015, First Crystal filed this action. Compl., ECF No. 1. In Counts I–V of its complaint, First Crystal asserts alternative theories for breach of contract based on GSA's failure to honor Mr. Joiner's exercise of GSA's alleged option to renew the lease for the eleventh floor space. Id. ¶¶ 32–52. In Count VI it claims that, in the event that Mr. Joiner lacked the authority to renew the lease as the government contends, then other "BRAC-affected leases identified in Paragraph 19 [of the complaint]" were improperly terminated because they were "effected by non-contracting officers." Id. ¶ 54. As relief, First Crystal asks that the Court "sustain the appeal" of the contracting officer's final decision, award damages including interest, and award any other appropriate relief. Id. at 27.

First Crystal filed its motion for summary judgment on May 16, 2016. ECF No. 18. On August 12, 2016, the government filed its response and cross-motion for summary judgment. ECF No. 21. Oral argument was held on January 12, 2017. See Order, ECF No. 29.

## DISCUSSION

### I. Subject Matter Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [i.e., the Contract Disputes Act]." Id. § 1491(a)(2). The Contract Disputes Act applies to contracts for, inter alia, "the procurement of property, other than real property in being." 41 U.S.C. § 7102(a); see also Forman v. United States, 767 F.2d 875, 878–79 (Fed. Cir. 1985) (holding that Contract Disputes Act applies to lease agreements).

Here, First Crystal is asserting contract claims arising out of a lease. It presented these claims to the contracting officer on February 4, 2014. Pl.'s Mot. Ex. 25. The contracting officer then issued a final decision on April 4, 2014. Pl.'s Mot. Ex. 26. Therefore, the Court has subject matter jurisdiction over the claims alleged in First Crystal's complaint pursuant to the Tucker Act and Contract Disputes Act.

### II. Summary Judgment Standards

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to

9

judgment as a matter of law. Rules of the Court of Federal Claims (RCFC) 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

"The moving party bears the burden of establishing the absence of any genuine issue of material fact," and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Id. at 1391. Further, the court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### III.   Counts I–V

The primary focus of the parties in briefing their cross-motions as to counts I–V of the complaint has been on whether Mr. Joiner, as a lease contracting specialist, had the authority to exercise the Lease's renewal option or whether, in any event, his exercise of the renewal option was ratified by the contracting officer. For the reasons set forth below, however, it is not necessary to address those issues because the terms of the option required a renewal of all of the space covered by the Lease, including the space on the third floor. Even assuming that he had authority to exercise the renewal option, Mr. Joiner did not unconditionally accept the terms of the option in his February 2012 email, because he sought to renew only the eleventh floor space. Further, to the extent that Mr. Joiner and Mr. Redding came to a subsequent verbal agreement regarding the eleventh floor space, such agreement was not a binding contract because it was never reduced to writing as the parties apparently contemplated and because, in any event, Mr. Joiner lacked the authority to modify the existing lease or bind GSA to a new one.

#### A.   **The Alleged Exercise of the Option to Renew**

A lease provision providing a party with the option to renew is an option contract. See 15 Williston on Contracts § 46:12 (4th ed. 2015). In order to create a valid and binding contract, an option must be accepted, see Uniq Comput. Corp. ex rel. U.S. Leasing Corp. v. United States, 20 Cl. Ct. 222, 230 (1990), and "an acceptance may not change, add to, or qualify the terms of the offer," 2 Williston on Contracts § 6:10 (4th ed. 2015). Thus, "[i]t is well settled that to properly exercise [an] option, the government's acceptance of that offer ha[s] to be unconditional and in exact accord with the terms of the contract being renewed." 4737 Conner Co. v. United States, 65 F. App'x 274, 276 (Fed. Cir. 2003) (quoting New Eng. Tank Indus. of N.H., Inc. v. United States, 861 F.2d 685, 687 (Fed.Cir.1988)) (alterations in original). Where the response to an offer does not match the terms of the offer, there is no acceptance and thus no formation of a contract. First Commerce Corp. v. United States, 335 F.3d 1373, 1381 (Fed. Cir. 2003) (citing Iselin v. United States, 271 U.S. 136, 139 (1926)) (observing that "[u]nder the traditional 'mirror image' rule . . . mismatch between offer and acceptance negates contractual liability"); see also 4737 Conner Co., 65 F. App'x at 276–77 (holding that inclusion of different term in purported exercise of lease renewal option converted purported exercise into counter-offer); Alliant

10

Techsystems, Inc. v. United States, 178 F.3d 1260, 1275 (Fed. Cir. 1999) (observing that the inclusion in a purported exercise of an option of "an affirmative requirement that depart[s] from the terms of the option" results in "the option clause impos[ing] no obligations"); Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 323–24 (Fed. Cir. 1997) (holding that Army's attempt to effect a "partial exercise" of the option was improper).

Here, the February 28, 2012 email sent by Mr. Joiner did not unconditionally accept the exact terms of the Lease's renewal option. See Pl.'s Mot. Ex. 5 at 1. In fact, in the email Mr. Joiner actually cited the language of Paragraph 5 of the original lease agreement, which had been superseded by the new Paragraph 5 set forth in SLA 1. The option set forth in SLA 1 covered more square footage and set a higher rental price than the square footage and rental rate set forth by Mr. Joiner in his email. Thus, by virtue of SLA 1, GSA was leasing from First Crystal 26,671 rentable square feet, which included 8,545 rentable square feet in Suite 1100/1100A, 11,695 rentable square feet in Suite 1106, and 6,431 rentable square feet in Suite 300. Pl.'s Mot. Ex. 2 at 1. Further, the Lease's renewal option, as amended, stated that the "Government shall have the right to one (1) renewal option for a FIVE-YEAR TERM at an annual rent of $1,156,935.80 [($43.378044/BRSF or $52.647818 / BOASF) + $6,343.44 for two (2) unreserved parking permits] for a total of $1,163,279.24 payable at the rate of $96,939.9367 per month in arrears." Id. at 2 (brackets in original).

Mr. Joiner did not match those terms in his purported exercise of the renewal option; in effect, he countered them. First, Mr. Joiner sought renewal of a different amount of rentable square feet than that provided for by the renewal option: the renewal option was for the leasing of 26,671 rentable square feet, while Mr. Joiner proposed renewing only 20,240 rentable square feet. Compare Pl.'s Mot. Ex. 2 at 1–2, with Pl.'s Mot. Ex. 5 at 1. Second, in his email, Mr. Joiner proposed a different rental rate. While the renewal option provided for renewal at a total annual rate of $1,163,279.24, Mr. Joiner's email proposed an annual rate of $880,402.80. Compare Pl.'s Mot. Ex. 2 at 2, with Pl.'s Mot. Ex. 5 at 1. Finally, Mr. Joiner not only sought to exclude the third floor portion of the leased premises from any renewal (contrary to the terms of the option), but also sought early termination of the Lease as to that space. Pl.'s Mot. Ex. 5 at 1. But neither selective renewal of only the eleventh floor space nor early termination of the third floor space was part of the Lease or its renewal option. See Pl.'s Mot. Ex. 2 at 2. Accordingly, Mr. Joiner's email included different and additional terms from the Lease's renewal option. It was thus not unconditional and not an acceptance, and could not operate as an exercise of the renewal option; instead, it served as a counter-offer. 4737 Conner Co., 65 F. App'x at 276–77; First Commerce Corp., 335 F.3d at 1381.

Indeed, notwithstanding its litigating position in this case, First Crystal's response to Mr. Joiner's February 28, 2012 email reflects that it did not understand him to be exercising the option set forth in Paragraph 5, as amended by SLA 1. In his responsive email, Mr. Redding stated (correctly, in the Court's view) that "the lease renewal option does not give the Government the right to selectively renew one portion of the leased space but not the rest." Pl.'s Mot. Ex. 7 at 1. For that reason, Mr. Redding responded to the email with another counter-offer, stating that First Crystal was "willing to accept the long renewal of just the 20,240 BRSF (16,760 USF) on the 11th floor per the renewal option terms stated in the lease" subject to several stated conditions. Id. Thus, First Crystal rejected Mr. Joiner's counter-offer and attempted to engage in further negotiations.

11

Because Mr. Joiner's February 28, 2012 email did not unconditionally accept the terms of the renewal option and sought different terms, it was not an acceptance but a counter-offer. Thus, even assuming that Mr. Joiner possessed the authority to exercise the renewal option (a proposition on which the Court expresses no position), he never did so. Instead, he initiated and engaged in negotiations with Mr. Redding regarding both the renewal of the eleventh floor space and the early termination of the third floor space.

### B. Modification of the Existing Lease/New Lease Agreement

Although Mr. Joiner's February 28, 2012 email did not exercise the Lease's renewal option, the question remains whether the parties came to any subsequent enforceable agreement modifying the Lease or entering into a new lease that provided a long-term extension of the eleventh floor space. At oral argument, the government conceded that—as a matter of fact—Mr. Joiner and Mr. Redding eventually reached a verbal agreement regarding the eleventh floor space. Oral Argument of Jan. 12, 2017 at 37:21. The government points out, however, that notwithstanding Mr. Redding's efforts to secure a written contract memorializing this verbal agreement, none was ever executed. Further, the government argues that Mr. Joiner lacked the authority to either modify the existing lease or enter a new one because he was not a contracting officer during the relevant time period.

"Oral understandings which contemplate the finalization of the legal obligations in a written form are not contracts in themselves." SCM Corp. v. United States, 595 F.2d 595, 598 (Ct. Cl. 1979) (holding that oral representations made by the parties did not constitute a contract where parties intended to execute written agreement and understood that such agreement was a condition precedent to payment). Rather, "[w]hen legal obligations between the parties will be deferred until the time when a written document is executed, there will not be a contract until that time." Id. (citation omitted).

Here, the record strongly suggests that both Mr. Joiner and Mr. Redding clearly understood that there would be no final, binding contract until the parties executed a supplemental lease agreement. Mr. Joiner closed his initial February 2012 email by noting it would "be followed up with a supplemental lease agreement in the near future." Pl.'s Mot. Ex. 5 at 1. When Mr. Redding emailed Mr. Joiner in August 2012, he indicated his concern that the parties "need[ed] to pick this renewal project up," stated that he "believe[d]" he and Mr. Joiner had a verbal agreement, and asked whether Mr. Joiner would be preparing a supplemental lease agreement. Pl.'s Mot. Ex. 13 at 1. When he followed up with Mr. Joiner again in September 2012, Mr. Redding asked "where are you on preparing the SLA for this one?" Id. On September 11, 2012, when Mr. Joiner replied by email, he stated that he would try to have a supplemental lease agreement to Mr. Redding "in the next couple weeks." Id. Thus, the parties appeared to understand that there would be no new lease until a supplemental lease agreement was signed.[8]

---

[8] The Court further notes that "[p]arties are presumed to know and required to be cognizant of the governing regulations." SCM Corp., 595 F.2d at 598. Thus, the parties' understanding that there would be no binding lease until the execution of a written agreement is also informed by both 48 C.F.R. § 570.801, requiring the contracting officer to use Standard Form 2 (or a short

12

Further, and in any event, even if there were some dispute in the record as to Mr. Redding's and Mr. Joiner's subjective understanding of the need to reduce their verbal agreement to writing, "[i]t is well established that a purported agreement with the United States is not binding unless the other party can show that the official with whom the agreement was made had authority to bind the government." Mil-Spec Contractors, Inc. v. United States, 835 F.2d 865, 867 (Fed. Cir. 1987) (quoting SER, Jobs for Progress, Inc. v. United States, 759 F.2d 1, 4 (Fed. Cir. 1985)). Here, Mr. Joiner lacked such authority.

Thus, as GSA's leasing desk guide provides, licensed contracting officers have "exclusive authority to enter into, amend, and administer leases on the Government's behalf." Def.'s Mot. App. at A212. They may delegate their authority to perform lease management only for tasks "not involving amendments to the lease." See id. The desk guide reflects the provisions defining a contracting officer's authority set forth in GSA's regulations. For example, 48 C.F.R. § 570.103(b) provides that "[t]he contracting officer has exclusive authority to enter into and administer leases on the Government's behalf." Id. And 48 C.F.R. § 570.402-1 states that it is the contracting officer who may enter into a "succeeding lease." Id.; see also id. § 1.601(a) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."); id. § 552.270-4(d) (contracting officers have "the authority to enter into, administer, and/or terminate contracts").[9]

Nor did Mr. Joiner have any implied authority to modify the Lease or enter into a new lease. Actual authority to bind the government is implied when it is integral to the duties assigned to the particular government employee. H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989). But Mr. Joiner cannot possess implied authority to modify an existing lease or enter a new one where, as here, governing regulations state that only a contracting officer has such authority. Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007) (finding that government official could not have implied authority to modify contract because the contract and regulations stated that only the contracting officer had authority to modify the contract).

Finally, First Crystal does not (and could not) argue that any verbal agreement reached by Mr. Joiner and Mr. Redding to extend the Lease as to only the eleventh floor was ratified by the contracting officer. "Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all

---

form alternative) to award leases, and 48 C.F.R. § 570.802, describing the use of specific forms to amend a lease, such as when "obtaining [the] partial release of space" or when "revising the terms of a lease."

[9] Further, to the extent that any agreement between Mr. Redding and Mr. Joiner is viewed as a modification of the amount of space to be leased, such a modification would be subject to 48 C.F.R. § 552.270-14. Under that provision, incorporated into the Lease, only the "Contracting Officer may . . . by written order, make changes within the general scope of this lease in any one or more of the following: . . . Amount of space, provided the Lessor consents to the change." Id. § 552.270-14(a)(4). Thus, absent the contracting officer's written change order pursuant to this section, the government cannot be held liable under the changes clause. Id. § 552.270-14(d).

persons, is given effect as if originally authorized by him.'" Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (quoting Restatement (Second) of Agency § 82 (Am. Law Inst. 1958)). "For ratification to be effective, a superior must not only (1) have possessed authority to contract, but also (2) have fully known the material facts surrounding the unauthorized action of her subordinate, and (3) have knowingly confirmed, adopted, or acquiesced to the unauthorized action of her subordinate." Leonardo v. United States, 63 Fed. Cl. 552, 560 (2005) (citations omitted), aff'd, 163 F. App'x 880 (Fed. Cir. 2006). Further, silence on the part of the authorized official "in and of itself is not sufficient to establish a demonstrated acceptance of the contract." Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1434 (Fed. Cir. 1998).

Here, First Crystal identifies no evidence that a contracting officer (or any other official with contracting authority) had knowledge of any subsequent lease modification or new lease agreed to by Mr. Redding and Mr. Joiner, much less that he or she acquiesced in such a modification or new lease. In fact, the only points at which a contracting officer seems to have been advised of developments regarding the Lease were when Mr. Joiner and Mr. Redding had their first exchange of emails in February 2012, and then in January 2013 after Mr. Joiner had informed Mr. Redding that GSA was not renewing the Lease and would seek to terminate it at the end of its term. See Pl.'s Mot. Ex. 8 at 2; Pl.'s Mot. Ex. 21 at 1.

Accordingly, First Crystal and GSA never entered an enforceable agreement to modify the existing lease or enter a new lease for the eleventh floor space. For that reason and the others set forth above, the government's motion for summary judgment as to Counts I–V of the complaint must be **GRANTED,** and First Crystal's motion must be **DENIED**.

## IV. Count VI of the Complaint

The complaint's sixth count alleges improper termination of other leases by GSA employees who were not contracting officers, as identified in paragraph nineteen of the complaint. See Compl. ¶ 54. First Crystal did not elaborate on Count VI in its motion for summary judgment or in opposing the government's motion other than to explain that it intended to argue "[o]nly in the alternative" that "if Mr. Joiner did not have the authority to exercise the lease renewal and GSA had not validly terminated the other BRAC-affected leases because the terminations were not [e]ffected by contracting officers," then First Crystal was entitled to "$15,913,544.00 in damages." See Pl.'s Opp'n to Def.'s Cross-Mot. for Summ. J. & Reply to Def.'s Response to Pl.'s Mot. for Summ. J. at 1 n.1, ECF No. 23.

The government has requested summary judgment as to Count VI on the ground, among others, that each of the leases identified by First Crystal was ultimately terminated by a supplemental lease agreement signed by a government official with authority to do so. See Def.'s Mot. at 9–11, 27. The government's appendix contains the supplemental lease agreements terminating each such lease. See Def.'s Mot. App. at A421–47.

In the face of these signed agreements, First Crystal provides no basis for its argument that "GSA did not validly terminate the BRAC-affected leases" or its claim that it is entitled to the rents "owed under the leases which had not been properly terminated." Compl. ¶ 54. The government is therefore entitled to judgment as a matter of law as to Count VI.

14

## CONCLUSION

For the reasons discussed above, First Crystal's motion for summary judgment is **DENIED** and the government's motion for summary judgment is **GRANTED**. The Clerk of the Court is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge